IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD STERNITZKE, et al. )
)
Plaintiffs, )
)
v. ) C.A. No. 01-1972
)
YELLOW FREIGHT SYSTEM, INC., )
GENERAL TEAMSTERS, CHAUFFEURS )
AND HELPERS LOCAL UNION 249, )
YELLOW CORPORATION, )
)
Defendants. )

## OPINION

Twenty-six individual plaintiffs, former employees of Preston Trucking Company, Inc. ("Preston"), have filed a two count Second Amended Complaint against Yellow Freight System, Inc. ("Yellow Freight"), a subsidiary of Yellow Corporation, and also against General Teamsters, Chauffeurs and Helpers Local Union 249 ("Local 249"). Plaintiffs seek compensatory and punitive damages, as well as declaratory relief, costs and attorney's fees to redress alleged violations of section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. Count I alleges a breach of the duty of fair representation against Local 249. Count II alleges that Yellow Freight breached its collective bargaining agreement.

We have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

Presently pending before the court are defendants' motions for summary judgment. On March 27, 2007, the Court held oral argument on these motions. A transcript of that argument has been prepared and is now a part of the record. Transcript of Oral Argument on Summary Judgement Motion held March 27, 2007 and corrections thereto ("S.J. Tr."), Doc. 105, 107.

For the reasons stated herein, we will grant the defendants' motions for summary judgment.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

1

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. . . ." Id. at 586-87 (citations omitted).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. Id., quoting Fed. R. Civ. P. 56(e); see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 248-49 (1986).

## II. STATEMENT OF FACTS

The basic facts are not in dispute, unless otherwise noted. Yellow Freight (now known as Yellow Transportation, Inc.) is a large, nationwide trucking company which had operated more than 350 trucking terminals located throughout all 50 United States. It is the largest of a number of subsidiaries of Yellow Corporation (now "YRC Worldwide, Inc."). Preston was a regional trucking company that operated approximately 66 terminals, almost exclusively in the northeastern United States.

Plaintiffs were truck drivers or dock workers employed by Preston Trucking until July 26, 1999, when Preston ceased its operations. Plaintiffs were represented by Local 249, located in Pittsburgh, Pennsylvania. Yellow Corporation was the holding company which owned Preston

2

from 1992 until Yellow Corp. sold Preston to certain individuals in July of 1998. During this time, Preston and Yellow Freight operated independently and maintained separate seniority lists. As part of the sale, the union negotiated wage concessions with Preston. The three owners, namely David Letke, Nicholas Marino and J. Sean Callahan -- former defendants herein -- operated Preston as an independent, privately held company for over a year.

The truck drivers and dockworkers for both Yellow Freight and Preston were employed under a series of collective bargaining agreements between the unionized trucking industry and the International Brotherhood of Teamsters. Since 1964, there has been a nationwide collective bargaining agreement known as the National Master Freight Agreement ("NMFA"). That agreement is negotiated on behalf of the Teamsters and its various local unions by the Teamsters National Freight Industry Negotiating Committee ("TNFINC") and by the employers through a national association known at various times as Trucking Management Inc. or Trucking Employers, Inc. Local 249 delegated its bargaining authority to TNFINC.

In addition to the NMFA, there are certain supplemental agreements covering employment conditions in various cities and regions around the country; these are negotiated between groups of local unions and employer associations. The applicable supplemental agreement covering the plaintiffs is known as the Joint Council 40 Supplemental Agreement (hereinafter referred to jointly and collectively as the "NMFA"). These collective bargaining agreements run for three to five year terms; the one applicable to the case at bar covered the period April 1, 1998 through March 31, 2003.

Central to our analysis of the case at bar is the interpretation of certain contractual provisions. First, Article 1, Section 3 of the NMFA states in relevant part:

> In the event an entire active or inactive operation, or a portion thereof, **or rights only**, are sold, leased, transferred or taken over by sale . . . such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. . . . it is understood that the signator Employer shall not sell, lease or transfer such a run or runs **or rights** to a third party to evade this agreement.
>
> . . .

3

> When a signator to this Agreement purchases **rights** from another signator, the provisions of Article 5 shall apply. The applicable lay-off provisions of this Agreement shall apply. . . .
>
> The term **rights** shall include route and runs.

Summary of Undisputed Material Facts ("SUMF") No. 95 (emphasis added).

Second, we must consider Article 5, Section 2 of the NMFA, which states, under the subsection "Purchase of Rights":

> (e) If a merger, purchase, acquisition, sale, etc., constitutes merely the acquisition of permits or rights, without the purchase or acquisition of equipment or terminals, and/or without the consolidation of terminals or operations . . . the following shall apply:
>
> Where the purchasing company has a terminal operation at the domicile of the employees of the seller, the employees of the selling company shall be placed on a master seniority list, and the purchasing company or companies shall hire, after recall of the purchasing company's employees from layoff, such employees as needed for regular employment within the first twelve (12) calendar months after purchase or acquisition of permits and/or rights, and they shall be dovetailed with full seniority.

SUMF No. 96. Under Article 8, section 6 of the NMFA, dovetailing (the process by which two or more seniority lists get combined) must occur in accordance with a specific change of operations procedure set forth therein. Under that section, the TNFINC initiates the change of operations procedure by informing an employer that it must file a change of operations notice, and then a Change of Operations Committee is formed. That committee then holds hearings with all of the concerned parties to determine how and whether seniority lists should be combined. SUMF Nos. 24 and 26.

On July 26, 1999, Preston went out of business and sent a letter from its Preston, Maryland location, in which it notified its customers that it was ceasing its operations, effective immediately. The letter explained – and the parties do not dispute – that the company had been having cash flow problems and was unable to obtain the necessary financing to continue its operations. On the same day, Preston and Yellow Freight allegedly entered into an agreement whereby Yellow Freight agreed to assist Preston's customers in picking up and delivering all

4

shipments currently in its network and by agreeing to honor Preston's pricing arrangements for a period of 30 days. Yellow sent out a news release, dated the same day as the customer letter, confirming this arrangement. However, Preston continued to deliver all of the existing freight in its system. Within a few weeks, all of the freight was gone from the Pittsburgh terminal and its computers and equipment were packed for transportation to Preston's headquarters in Maryland. After July 26, 1999, no seniority lists at any Preston facilities were dovetailed into any Yellow seniority lists.

Also on July 26, 1999, after unsuccessfully attempting to sell its customer list to several other trucking companies, Preston was able to sell its customer list to Yellow Corporation for $300,000. Another trucking company, Overnight, purchased the list of customers who shipped to and from Puerto Rico for $50,000 plus a percentage of earn-out based on revenue.

On or about August 3, 1999, Preston filed for Chapter 7 bankruptcy. On August 23, 1999, a representative of Local 249, union business agent Michael Ogden ("Ogden"), filed a grievance against Preston on behalf of its employees who were represented by Local 249, including the Plaintiffs ("the Grievance" or the "First Grievance"). According to Ogden, he filed the grievance in order to ensure that all of the contractual rights of the Preston employees were protected. The Grievance was a blanket grievance against Preston only, covering all articles of the NMFA. According to the Plaintiffs, they specifically sought to gain seniority rights with Yellow Freight; defendants dispute this. Notably, the Union failed to include Yellow Freight as a party to the Grievance. None of the Plaintiffs insisted that the grievance be filed against Yellow Freight, nor did Plaintiffs go to Yellow Freight seeking to be placed on the Yellow Freight seniority list in accordance with their Preston service.

On October 15, 1999, Ogden, believing that it was unnecessary to proceed with the grievance because Preston had represented that they would comply with all the terms of the NMFA, withdrew the Grievance, without notifying the Plaintiffs or any other former Preston drivers, via the steward committee. There is no dispute that he was not required by law or by the teamsters

constitutional bylaws to notify the plaintiffs, although it is clear that he probably should have notified the plaintiffs.

According to the Plaintiffs, in June 2000, Ogden and other union representatives led several of the Plaintiffs to believe that there had been no resolution of the Grievance, but that the union was still pursuing the Grievance through Bankruptcy Court. Plaintiffs did not discover that the Grievance had been withdrawn until August 18, 2000. When several of the Plaintiffs confronted Ogden about the withdrawal of the Grievance, Ogden stated that all issues, including the Grievance, were being handled by the Bankruptcy Court. According to Local 249, Ogden withdrew the grievance because all of the monetary issues were being resolved in the bankruptcy proceeding and there were no other contractual issues to resolve. Plaintiffs contend that Ogden improperly withdrew the grievance and lied to them about it, thereby breaching the duty of fair representation.

TNFINC conducted its own investigation to determine if the Preston/Yellow transactions were legitimate. Plaintiffs admit that TNFINC did not breach any duty of fair representation owed to them. As explained above, under the NMFA, if TNFINC believes that an event triggering dovetailing has occurred, TNFINC has the right to require the employer to file for a "change of operation" plan, which is then submitted to the Change of Operations Committee under the NMFA. After its investigation of the Preston closing, TNFINC concluded that a change of operation did not occur. According to James McCall, legal counsel to TNFINC who attended a meeting between TNFINC and Preston's Vice President of Labor Relations, TNFINC considered the purchase of the customer list and decided that it did not implicate a change of operations procedure because, in his vast experience, just like the other purchases of customer lists in the industry, a purchase of a customer list is not a sale, purchase or transfer of an operation within the meaning of Article 1, Section 3. According to Local 249, then, there was nothing that Ogden or Local 249 did or could have done which would have resulted in a different outcome regarding plaintiff's claim for dovetailed seniority rights at Yellow. In other words, because TNFINC decided to take no action to convene a Change of Operations Committee, and because only TNFINC has the authority to

convene such a committee, no Change of Operations Committee would have been convened regardless of any actions that Mr. Ogden did or did not take.

Nevertheless, in the course of the bankruptcy proceedings, the International Brotherhood of Teamsters hired attorney Frederick Perillo to represent its interests and those of all Preston's Teamster employees regarding their claims against Preston. Among other duties, including serving on the creditors' committee, Perillo, at Plaintiffs' request, investigated the allegation that there had been collusion between Yellow Corporation or Yellow Freight and Preston's management. He conducted his own investigation and reviewed various documents relating to the fact that Yellow had purchased Preston's customer list and that Yellow had agreed to honor Preston's pricing for a period of 30 days. Perillo was unable to find evidence which he thought would support a claim that Preston's drivers could have their Preston seniority dovetailed onto the Yellow Freight seniority list.

In either September or October of 2000, several Plaintiffs met with representatives of Local 249, who advised the Plaintiffs that the Union would re-file the Grievance. A second set of grievances were filed on November 16, 2000 (collectively, the "Second Grievance"), this time against Yellow Freight. (By this point, Preston was out of business and in bankruptcy, so the Second Grievance was filed solely against Yellow Freight.) The Second Grievance was served on Yellow on December 20, 2000. In it, the union requested that all former Preston employees be hired by Yellow Freight and dovetailed into the seniority roster of Yellow Freight employees according to their seniority level at the time Preston closed. The Second Grievance was dismissed by the Eastern Region Joint Area committee on April 23, 2001 for procedural defects in that, under the union contract, the Preston drivers had seven days from the date they knew or should have known about the evidence in order to file a timely grievance against Yellow Freight and they failed to do so.

Prior to its closure, Preston operated primarily as a regional carrier hauling freight over relatively short distances. In contrast, Yellow was a national carrier hauling primarily long-distance

7

shipments. Yellow was unionized. Within Preston's northeastern territory, Preston faced significant price competition from non-union carriers. After Preston's closure, roughly 95 percent of its business was dispersed to other trucking companies and not to Yellow.

However, Yellow Freight attempted to obtain additional business as a result of Preston's closure. First, for several weeks after the closure, it called Preston's customers and sought the opportunity to haul their freight. Second, it processed repricing quotations from Preston's customers who sought to take advantage of the lower tariffs that Preston had quoted them. The revenue generated over the course of the first year after the closure, $20 million, amounted to nearly 4.5 percent of Preston's business nationwide. Furthermore, Yellow Freight purchased some Preston trailers and forklifts at the bankruptcy auction and hired a few former Preston drivers as new employees, none of whom have filed a grievance under the NMFA in which they allege that they were wrongly treated as new hires rather than drivers with Preston seniority. There is no evidence that Yellow Freight consolidated any portion of the Preston operations with its own or that Yellow freight combined any terminals with the terminals of Preston.

## III. DISCUSSION

Plaintiff's Second Amended Complaint alleges a "hybrid"/section 301/duty of fair representation claim wherein the employee files a claim against the union alleging breach of the duty of fair representation (Count I) and a claim against the employer alleging breach of the collective bargaining agreement (Count II). In the "hybrid" suit, the plaintiff will have to prove that the employer breached the collective bargaining agreement in order to prevail on the breach of duty of fair representation claim against the union, and vice versa. See United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 66-67 (1981). Thus, the claims are "inextricably interdependent." Id.; see also DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983). "Such a hybrid action really alleges that the process of collective bargaining has broken down." United Steelworkers v. Crown Cork & Seal Co., 32 F.3d 53, 58 (3d Cir. 1994).

8

## A. Statute of Limitations

In their briefs in support of their motions for summary judgment, both Local 249 and Yellow Freight argue that plaintiffs' claim for breach of the duty of fair representation is barred by the six month statute of limitations. This is not the first time we have been presented with this argument. In fact, when ruling on the motions to dismiss, we disagreed with the defendants and denied their motions to dismiss on the grounds of the statute of limitations, and Plaintiffs now argue that we are barred by the doctrine of law of the case from revisiting this issue.

"The law of the case doctrine limits relitigation of an issue once it has been decided in an earlier stage of the same litigation." Hamilton v. Leavy, 322 F.3d 776, 786 (3d Cir. 2003). The doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity. In re City of Philadelphia Litig., 158 F.3d 711, 717-18 (3d Cir. 1998). The doctrine, however, precludes review of only those legal issues that the prior court actually decided, either expressly or by implication. Southco, Inc. v. Kanebridge Corp., 324 F.3d 190, 194 (3d Cir. 2003). It does not restrict the power of the court, but rather governs its exercise of discretion. In re City of Phila. Litig., 158 F.3d at 718. Therefore, the law of the case doctrine does not preclude reconsideration of previously decided issues in "extraordinary circumstances," such as where (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice. Id.; Southco, 324 F.3d at 194. The rationale behind the new evidence exception to the law of the case doctrine is that when the record contains new evidence, "the question has not really been decided earlier and is posed for the first time." Bridge v. United States Parole Comm'n, 981 F.2d 97, 103 (3d Cir.1992). But this is so only if the new evidence differs materially from the evidence of record when the issue was first decided and if it provides less support for that decision. In re City of Phila. Litig., 158 F.3d at 720. Accordingly, if the evidence at the two stages of litigation is "substantially similar," or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply. Hamilton, 322 F.3d at 786-787.

9

Ogden withdrew the Grievance filed on behalf of the Preston employees on October 15, 1999. Viewing the evidence in the light most favorable to the non-movant, plaintiffs did not know about the withdrawal until August 18, 2000. This suit was not filed until October 22, 2001. At the time of our consideration of the motion to dismiss, plaintiffs were alleging that the second grievance, filed against Yellow Freight on December 15, 2000, was one of the bases of the union's alleged violation of its duty of fair representation. However, plaintiffs now have abandoned that argument and admit that their only claim of Local 249's breach of the duty of fair representation relates to the conduct of Local 249 business agent Michael Ogden in 1999. Mr. Ogden no longer acted as in the capacity of local union business agent as of December 31, 1999. We now find that this claim is time-barred.

In DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 172 (1983), the United States Supreme Court held that the six-month limitations period under § 10(b) of the National Labor Relations Act, 29 U.S.C.A. § 160(b), for filing unfair labor practice charges, applies to an employee's "hybrid" action against an employer and the union. The limitations period commences "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." Vadino v. A. Valey Eng'rs, 903 F.2d 253, 260 (3d Cir. 1990). The limitations period for a fair representation claim begins to run when the plaintiff knows or reasonably should have known of the acts contributing to the union's wrongdoing in failing to adequately represent the member's interests. Miklavic v. USAir Inc., 21 F.3d 551, 556 (3d Cir.1994). Even if there has been no explicit notice, the statute of limitations begins to run when "the futility of further union appeals became apparent or should have become apparent." Scott v. Local 863, Int'l Bhd. of Teamsters, 725 F.2d 226, 229 (3d Cir.1984).

Moreover, the Supreme Court instructs that, where a collective bargaining agreement establishes a grievance procedure, as it does in the case herein, an employee must at least attempt to exhaust such a process. Vaca v. Sipes, 386 U.S. 171, 185 (1967). An employer cannot be held liable for breach of a collective bargaining agreement unless it can be shown that the employee

unsuccessfully sought relief through the union grievance procedure. Id.

Plaintiffs contend that they were required to exhaust contractual remedies and therefore the statute of limitations did not begin to run until the Second Grievance (filed for the first time against Yellow, not Preston) was dismissed by the Eastern Region Joint Area Committee on April 23, 2001. It is clear from the evidence that the Second Grievance, now against Yellow Freight, was a completely separate grievance, and was not an exhaustion of the grievance procedure regarding the First Grievance– a blanket grievance covering all articles of the NMFA. The First Grievance was terminated on the day it was withdrawn by Ogden. The cause of action for breach of duty of fair representation does not relate to the second grievance, but rather the first one.

We hold that this action was not properly brought within the six month statute of limitations. Plaintiffs herein discovered that they were allegedly injured on the day they learned that Ogden had withdrawn the First Grievance. See Taylor v. Ford Motor Co., 761 F.2d 931, 932 (3d Cir. 1985). Where the plaintiff former employee brought a hybrid action against the defendant employer for breach of the collective bargaining agreement by failing to recall the plaintiff to a job vacancy and against the defendant union alleging that the union breached its duty of fair representation by failing to enforce an arbitrator's award, the court in Taylor held that the six–month limitation period began to run on the date that the union notified the employee that it would take no further action to enforce the arbitration award for retroactive pension credits. The court concluded that since the plaintiff brought his cause of action almost two years later, it was time–barred.

Where the plaintiff employee brought a hybrid action against the defendants, an employer and a union, arising from a dispute regarding overtime pay, and where the union withdrew the employee's grievance, the court in Matter v. Bethlehem Steel Corp., 797 F. Supp. 441 (W.D. Pa. 1992), held that the six–month limitation period began to run when the employee knew, or through the exercise of reasonable diligence should have known, of the union's decision or action, and that such date was when a union representative and an employer representative agreed that the employee's grievance would be withdrawn. The plaintiff alleged that the union representative and

11

the employer representative did not arrive at a decision or refer the matter to an arbitrator within 10 days as required by Step 4 of the grievance procedure. Instead, on March 12, 1990, the union representative and the employer representative agreed that the grievance would be withdrawn. The plaintiff argued that the grievance was withdrawn without a proper decision and without his consent. The court stated that although the union and employer's agreement that the grievance would be withdrawn did not constitute a final decision of an arbitrator, the action of the employee's union representative in agreeing that the employee's grievance would be withdrawn was a final action because the grievance procedure was exhausted and had broken down to the employee's disadvantage and the action clearly manifested the union's decision not to proceed further with the employee's grievance. The plaintiff filed his complaint on January 30, 1991, approximately 10 1/2 months after the defendants withdrew his grievance. The court stated that the union was not required to give the plaintiff actual notice that it was not going to pursue the grievance. Instead, noted the court, the statute of limitations began to run when the employee should have reasonably known that further appeals to the union would be futile. The court concluded that even if the plaintiff did not receive actual notice of the March 12, 1990, decision, the plaintiff should have become aware that the union would take no further action within a reasonable period of time after March 12, 1990. Accordingly, the court held that the plaintiff's hybrid claims were time-barred.

Plaintiffs herein had notice that the union would proceed no further with the grievance when they learned it had been withdrawn on August 18, 2000 and that Ogden had filed the First Grievance against the wrong company. At that point plaintiffs could have argued that they could file a new grievance within seven days (on or before August 25, 2000) because they now, under the case law, "knew or should have known" of Ogden's conduct, or they could have filed a duty of fair representation lawsuit within the six month statute of limitations. See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151 (1983); Taylor, 761 F.2d at 932. They did neither.

Instead, they filed the Second Grievance in 2001 – which in and of itself was clearly untimely. The futility of the Second Grievance was obvious. We find that the filing of the Second

12

Grievance cannot toll the statute of limitations relating to the First Grievance because to rule otherwise would unfairly encourage the filing of motions for reconsideration or other internal appeals and would lead to an unjust result. In Kolomick v. United Steelworkers of America, Dist. 8, AFL–CIO, 762 F.2d 354 (4th Cir. 1985), the court held that the six–month limitation period began to run when the union notified the employee that it would not pursue his discharge to arbitration. In that case, when the union notified the plaintiff that it would not pursue arbitration, the plaintiff filed a charge with the National Labor Relations Board (NLRB) pursuant to § 10 of the NLRA, claiming that the union's refusal to proceed to arbitration constituted an unfair labor practice in violation of the NLRA. The plaintiff argued that the six–month statute of limitations was tolled by the filing of his unfair labor practice charge. The court rejected the plaintiff's argument and held that the filing and pendency of an unfair labor practice claim before the NLRB does not toll the statute of limitations for filing a hybrid action in federal court against an employer for breach of the collective bargaining agreement and against the union for breach of its duty of fair representation. The court stated that tolling does not to apply in situations where a plaintiff pursues parallel avenues of relief. Since the plaintiff filed his hybrid action more than nine months after the union notified him that it would not pursue arbitration, the court concluded that the plaintiff's action was time-barred. See also Williams v. Chrysler Corp., 163 F.3d 183, 187 (3d Cir. 1998) (untimely motion for reconsideration pursuant to a union internal appeal procedure cannot toll the six month statute of limitations because this would encourage late filing of motions for reconsideration).

At bottom, it would cause manifest injustice if we were to enable the Second Grievance to restart the statute of limitation clock, because this would eliminate the effect of the statute of limitations all together. Otherwise, plaintiffs could keep refiling the same grievances over and over again, arguing each time that the result might come out differently, and then later file their breach of duty of fair representation lawsuit within six months of the last denial of their claims. The six-month DelCostello rule must remain intact.

Separately, Yellow Freight has argued that Plaintiffs' grievances were untimely

13

under the NMFA, in addition to the six month statute of limitations, because under the clear terms of the collective bargaining agreement, all grievances must be reduced to writing and served on the employer within seven days of the event giving rise to the grievance or the date that the basis for the grievance first became known. Yellow Freight contends that because plaintiffs failed to meet this contractual requirement, their grievances were untimely and properly subject to dismissal on a point of order. Yellow Freight argues that without a meritorious grievance, by definition, there can be no liability for breach of contract, and summary judgment must be entered in favor of Yellow Freight, citing Vaca, 386 U.S. at 195.

Plaintiffs admit in the Statement of Undisputed Material facts that under the union contract, Preston drivers had seven days from the date they knew or should have known about an alleged breach in order to file a timely grievance against Yellow Freight. Plaintiffs also admit that the purpose of this rule is to make the company aware that there is a claimed infraction of the contract. Assuming that Plaintiff's claims regarding Mr. Ogden's conduct are true, and they did not know until August 18, 2000 that he had filed the First Grievance against the wrong company, as of that date, Plaintiffs knew all of the factual bases upon which this lawsuit is now based. They failed to reduce their grievance to writing and serve Yellow Freight on or before August 25, 2000. Instead the Second Grievance was filed November 16, 2000 and Yellow became aware of the plaintiffs' claims against Yellow on December 15, 2000. Thus, Plaintiffs' grievances against Yellow Freight were untimely under the union contract, were properly subject to dismissal by the Eastern Region Joint Area Grievance Committee. The futility of the Second Grievance should have been apparent to the Plaintiffs, who, according to the Statement of Undisputed Facts No. 88, knew that the seven day rule applied. Vadino, 903 F.2d at 260.

Accordingly, we will grant the defendants' motions for summary judgment on the grounds of timeliness.

### B. Breach of Collective Bargaining Agreement

Although we have ruled that this cause of action is untimely, we next turn to an

14

alternative basis for dismissal of this action, namely, the fact that there has been no breach of the collective bargaining agreement.

If Plaintiffs cannot prove a violation of the collective bargaining agreement, they therefore cannot prevail in their "hybrid" Section 301 action. Griesmann v. Chemical Leaman Tank Lines, Inc., 776 F.2d 66, 73 (3d Cir. 1985). As Local 249 argues, Plaintiffs must establish that the *employer* violated the collective bargaining agreement in order to recover *against a union* in a case where the allegation is related to contract administration, citing, inter alia, DelCostello v. Int'l Bhd. of Teamsters, 462 U.S 165 (1963).

Local 249 argues that because the Preston operation was not transferred to Yellow Freight, Article I, Section 3 of the collective bargaining agreement does not apply. That portion of the NMFA states, as noted supra, "in the event an entire active or inactive operation, or a portion thereof, *or rights only*, are sold, leased, transferred, . . . such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof." According to Plaintiffs, when Yellow Freight purchased Preston's customer list for $300,000, it thus purchased "rights" from Preston. Furthermore, they argue that because only a few of Preston's employees were subsequently hired, and none were dovetailed onto Yellow Freight's seniority list, Yellow Freight violated Articles 1 and 5 of the NMFA. Plaintiffs point out that pursuant to Article 1, Section 3 of the NMFA, if Yellow Freight purchased "rights" from Preston, it then attempted to "evade this Agreement" by failing to dovetail plaintiffs.

Thus, the central issue in this case is the meaning in the NMFA of the term "rights," which, unfortunately, is not defined in the four corners of the NMFA. We find that Yellow Freight did not violate the collective bargaining agreement because the sale of Preston's customer list did not amount to the sale of "rights" within the clear and established meaning of the collective bargaining agreement.

> A collective bargaining agreement is a contract between the parties, and must be examined in light of the usual principles of contract interpretation, as well as in light of federal policy. Where the language of a contract is clear and unambiguous, and leads to a meaning which is both reasonable and sensible there is

15

> no need to look beyond it in search of some other intention. F. D. Rich Company v. Wilmington Housing Authority, 392 F.2d 841, 842 (3d Cir. 1968); 4 Williston on Contracts § 609 (3d ed. 1961).

Bechtel Power Corp v. Wyoming Valley Bldg. & Constr. Trades Council, 496 F. Supp. 175, 177 (M.D. Pa. 1980). Yet a collective bargaining agreement "is much more than traditional common law employment terminable at will. Rather, it is an agreement creating relationships and interests under the federal common law of labor policy." Bowen v. United States Postal Serv., 459 U.S. 212, 220 (1983). A collective bargaining agreement "calls into being a new common law – the common law of a particular industry or of a particular plant. . . . Gaps may be left to be filled in by reference to the practices of the particular industry." Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579-80 (1960). Past practice takes on a paramount role in the interpretation of such agreements. Id. at 581-82.

The parties agree that the "rights" language as used in this section of the NMFA at issue herein is the same language that had been used in Article 1, Section 3 of the 1976-1979 NMFA and the 1979-1982 NMFA. Prior to 1980, interstate trucking companies had to apply to the federal government for rights in order to move freight over certain lanes of the country. In 1980, however, the trucking industry was deregulated, making it no longer necessary for trucking companies to apply for or purchase "rights" as that term was used in the earlier NMFAs. According to the defendants, after deregulation, the term "rights" became moot, although it remained in all subsequent NMFAs.

Plaintiffs argue that the plaining and reasonable meaning of the term "purchase of rights" includes the purchase of a customer list. They urge us to avoid the use of extrinsic evidence in interpreting the contract, yet in the event we decide that the contract is ambiguous, plaintiffs argue that there are genuine issues of material fact as to the meaning of the term "rights." However, Plaintiff's argument that we should define the term "rights" in accordance with the definition found in a dictionary would lead to an unreasonable result, rather than giving effective meaning to the term. We note further that the plaintiffs have admitted in their Memorandum in Opposition to

16

Defendants' Motions for Summary Judgment (Doc. 89) that there have been no known grievances filed or cases decided after 1980 where the grievants were seeking dovetailing as a result of the sale of a customer list, and there have been no decisions by any national or regional committee that has interpreted the term "rights" in the NMFA since 1980.

We have carefully reviewed all of the evidence submitted by the parties and find that there is no genuine issue of material fact in this regard. We look to the nature of the collective bargaining agreements in general, the structure and history of the NMFA, the experience of the trucking industry under that agreement, and the judgments of those individuals most knowledgeable in the field who have responsibility for the implementation of the NMFA. The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor, and the Plaintiffs herein have not so demonstrated.

According to the uncontested material facts, prior to the deregulation of the trucking industry in 1980 under President Reagan, Article 1, Section 3 of the 1979-1982 NMFA contained the term "rights." Plaintiffs have admitted that as used in this provision it refers to "operating rights" granted by the federal government and the states which allowed motor carriers to move freight over certain lanes. After deregulation, this section of the NMFA underwent a minor change to include "or a portion thereof"; this remained unchanged until 1998 when a reference to active or inactive operations was added. However, there were no negotiations after 1979 as to any change in the meaning of the term "rights" that would henceforth be applied in the world of deregulated trucking. The term, although moot, remained in the NMFA, even though motor carriers no longer faced barriers to acquiring rights to handle interstate shipments after 1980 and no longer needed to transfer such rights. The parties simply did not have to renegotiate the subject in the event of future, although doubtful, regulation in that area.

In addition, the meaning of the term "rights" was clear and unambiguous when it was added to the contract at the time, and because it leads to a meaning that is both reasonable and sensible given the context at the time, we see no reason to look beyond it in search of some other

17

intention. The term was a term of art to refer to the transfer of operating authority in the regulated environment. The practice in the trucking industry before 1980 was to construe "rights" in a manner consistent with the historic requirement that any motor carrier obtain operating authority either from the government or by purchasing "rights" from another carrier. Moreover, the defendants have shown, through the union's expert witness James McCall, the special counsel to TNFINC Frederick Perillo, Esq., former Chairman of the Central States Change of Operations Committee Hal Franke, Yellow Freight retired Vice President of Labor Relations Kermit Scarborough, and the Chairman of the Freight Grievance Committee for Western Pennsylvania, that the appropriate legal interpretation of the agreement does not support Plaintiff's theory of liability.

Finally, we note that because we have found that there has been no breach of the collective bargaining agreement, we need not address the question of whether or not Mr. Ogden's conduct constituted a breach of the duty of fair representation. DelCostello, 462 U.S. at 165 (where the allegation is related to contract administration, plaintiffs cannot prevail against the union unless they also establish that the employer violated the collective bargaining agreement).

## IV. CONCLUSION

For all of the aforementioned reasons, we will grant the motions for summary judgment filed on behalf of the defendants.

Date: February 6, 2008

Maurice B. Cohill, Jr.
United States District Court Senior Judge

18